590 A.2d 40

**Marie YACKOBOVITZ and Edward Yackobovitz**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AU-THORITY, Commonwealth of Pennsylvania, Department of Transportation and City of Philadelphia (Four Cases).**

**Appeal of CITY OF PHILADELPHIA (Two Cases).**

**Appeal of Matthew WOLFORD.**

**Appeal of SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 1990.

Decided April 15, 1991.

Reargument Denied May 23, 1991.

158

Alan C. Ostrow, Asst. City Sol., Philadelphia, for appellant, City of Philadelphia.

Joan A. Zubras, Philadelphia, for appellant, Southeastern Pennsylvania Transp. Authority.

Eric Gavin Marttila, Sagot, Jennings & Sigmond, Philadelphia, for appellee, Marie Yackobovitz.

Brian K. Wiley, Deputy Atty. Gen., with him Allan E. Ells, Deputy Atty. Gen., Philadelphia, for appellee, Com.

Before COLINS and PELLEGRINI, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

This is a consolidated direct appeal from a decision of the Court of Common Pleas of Philadelphia County which found the defendant City of Philadelphia (City) primarily liable and the Southeastern Pennsylvania Transportation Authority (SEPTA) secondarily liable, and absolved the Commonwealth of Pennsylvania, Department of Transportation (PennDot) of any liability for injuries sustained when plaintiff Marie Yackobovitz stepped into a pothole located in a street railway roadbed on Allegheny Avenue. Additionally, PennDot appeals the trial court's finding that PennDot was in contempt for failure to honor a settlement agreement.

On March 25, 1982, Marie Yackobovitz stumbled into a pothole located within eighteen inches of a SEPTA trolley rail on Allegheny Avenue, a state highway, in the city of Philadelphia. She and her husband (Yackobovitzs) filed a complaint against PennDot and SEPTA for injuries sustained as a result of that fall. PennDot and SEPTA joined the City as an additional defendant, and all of the defendants cross-claimed each other.

The parties agreed to resolve the matter through Philadelphia Local Rule 190 "High–Low" arbitration.[1] All parties agreed to be bound by the procedural provisions of Rule 190 except that 1) the Yackobovitzs reserved the right to pursue the collection of delay damages pursuant to Pa.R.C.P. 238; 2) the issue of delay damages would be certified by the trial court for appellate review; and 3) each defendant agreed to pay a one-third share of the award, excluding delay damages, at the conclusion of the arbitration.

The parties stipulated that Marie Yackobovitz was injured on March 25, 1982, after she stumbled into a pothole within eighteen inches of a trolley track rail owned by SEPTA on Allegheny Avenue, which is a Philadelphia city street "adopted" by PennDot as a state highway. The parties also stipulated that the trolley track facilities on Allegheny

1. Rule 190. Voluntary High–Low Common Pleas Court Arbitration provides for a final determination in cases in which money damages are sought. Submission of a case is voluntary, and all parties must agree to the arbitration which is binding. The parties agree on one or more judges before whom they wish their case submitted, and are required to submit a stipulation signed by counsel for all parties, indicating that the decision of the judge is final and that the award may be entered as a judgment of record without the right of appeal. The stipulation shall also include any agreements with respect to the conduct of the arbitration hearing. Unless the parties agree in advance, the conduct of the hearing is subject to the rules applicable to Common Pleas Court Arbitration. The judge determines whether the arbitration is being conducted within the fair scope of any agreement. Within twenty-four hours of the hearing, the judge reaches a decision and decides on an amount to be awarded, if any, to each party. That amount is then compared with the plaintiff's lowest demand and defendant's highest offer and awarded accordingly. Any rules dealing with pre-judgment delay damages, interest and/or costs are deemed waived by submission of a case to arbitration.

Avenue where Marie Yackobovitz fell are subject to an Agreement and Lease [2] entered into between SEPTA and the City on September 27, 1968 (Lease), and that this agreement and another agreement [3] (Leaseback) the parties signed at the same time address the issue of "Leased Property" maintenance.

To dispose of the governmental parties' claims and cross-claims for indemnification and contribution, the parties stipulated that the controlling legal issue was the determination of who was responsible for the maintenance of the trolley track area, including the trolley rails, the roadbed between the rails, and the roadbed within eighteen inches of the outermost rails on the day Marie Yackobovitz complained of her fall. They further agreed to permit the trial court to certify this issue for appellate review, and agreed that the related issue of the indemnification provision contained within the 1968 Lease and Leaseback Agreements (J.R. p. 389a) between the City and SEPTA would control the issue of leased property maintenance between those parties.

All governmental parties agreed to waive what were characterized as absolute defenses such as statutes of limitations, permanency of injury and actual written notice. PennDot's counsel also reiterated that the defendants had agreed to pay a one-third share of the arbitration award, and that the trolley track maintenance issue was to be preserved and would be disposed of on appeal.

After a hearing, the trial court found that the City was primarily liable and SEPTA secondarily liable, and awarded the Yackobovitzs $38,000.00 in compensatory damages and $22,724.00 in Rule 238 delay damages. Both the City and SEPTA appealed from that decision.

**2.** *See* Agreement and Lease made as of September 27, 1968, between SEPTA, as Lessor, and the City, as Lessee. (J.R. p. 389a). ("J.R." refers to the Joint Record, while "S.R." refers to the Supplemental Record).

**3.** *See* Lease made as of September 27, 1968, between the City as Lessor and SEPTA as Lessee. (J.R. p. 407a).

Because of his belief that the settlement was abrogated by the trial court's action, PennDot's counsel advised the Yackobovitzs that PennDot did not intend to pay one-third of the award as originally agreed. The Yackobovitzs then filed a petition to hold PennDot's counsel in contempt of court, which the trial court granted, finding PennDot's decision not to pay its share of the damage award to be in contravention of the settlement of record. The trial court's orders at No. 456 C.D. 1990 and No. 503 C.D. 1990 awarding the Yackobovitzs damages and at No. 181 C.D. 1990 denying the City's post-trial motions and the contempt order at No. 179 C.D. 1990, are all on appeal before us.

## I.

Central to the determination of the appeal is who is responsible for roadbed maintenance between and adjacent to the street railway tracks on Allegheny Avenue. It has been consistently held that unless altered by contract or ordinance, the entity operating a street railway is obligated to maintain and repair those portions of the streets on which its street railway tracks are located. As our Supreme Court in *Culver v. Lehigh Valley Transport Co.*, 322 Pa. 503, 507, 186 A. 70, 72 (1936) stated:

> It is recognized with substantial unanimity that a railway company, whether general or passenger, is bound to keep portions of the streets occupied by its rights-of-way in a good condition, even in the absence of any express contract or statutory direction to that effect.[4]

The area which a street railway is required to maintain is that "space between the rails and for eighteen inches on each side of them, in a safe and passable condition and repair as a duty or obligation incident to its operation of the

4. *See also: City of McKeesport v. Pittsburgh, McKeesport & Connellsville Railway Company*, 55 Pa.Superior Ct. 47 (1913); *Commonwealth v. Newton Township*, 276 Pa. 172, 120 A. 123 (1923); *Culver v. Lehigh Valley Transit Company*, 322 Pa. 503, 186 A. 70 (1936); *Illingsworth v. Pittsburgh Railways Company*, 331 Pa. 369, 200 A. 89 (1938); *Bosack v. Pittsburgh Railways Company*, 410 Pa. 558, 189 A.2d 877 (1963).

... railway line ..." *Township of Horsham v. Public Service Commission,* 97 Pa.Superior Ct. 366 (1929).[5]

The City has assumed more responsibility for street roadbed maintenance than it ordinarily would have at common law several times since street railways began operating on its streets. In 1907, the City and the Philadelphia Rapid Transportation Company (PTC) entered into an agreement, whereby the City assumed the responsibility to repair and maintain the roadbed in exchange for cash payments. This agreement was for a term of fifty years and was extended for another five years, and accordingly, expired in July 1962. Upon the expiration of that agreement, the obligation to repair the portion of the roadbed occupied by its street railway reverted to the PTC.

To facilitate the establishment of an integrated transportation system both in Philadelphia and in Southeastern Pennsylvania, the City again assumed more responsibility than a local government would ordinarily have assumed when it entered into two agreements in 1968 with SEPTA. (*See* Footnotes #3 and #4, *supra.*) These agreements were executed to combine the "soon to be owned" SEPTA transit facilities with City-owned transit facilities, provided a method to finance such a combination, and, at issue here, delineated their respective rights and obligations to each other.

In an agreement titled "Agreement and Lease" dated September 27, 1968 (Lease), SEPTA leased to the City transit properties that it was acquiring from the PTC. The Lease provided, in relevant part:

* SEPTA reserved the right to use and occupy city streets. (Section 1.02).[6]

**5.** The eighteen-inch rule was established because the street railway ties underneath the street railway tracks extend outside those tracks for approximately fifteen inches. Because the street railway crews excavate several inches from the ties, the eighteen-inch rule was established for a railway operator's responsibility. (J.R. 190a–191a).

**6.** 1.02—Right to Use City Streets
The Authority shall have the right to use and occupy the City streets to the extent necessary to maintain, repair or replace facilities and

\* The City was obligated to maintain and repair PTC transit facilities conveyed under the Lease. (Section 2.06).[7]

Simultaneously, the City, in an agreement titled "Lease" also dated September 27, 1968 (Leaseback), leased back to SEPTA the properties that SEPTA was to acquire from the PTC, as well as city-owned transit facilities. The Leaseback Agreement provided that:

\* SEPTA is responsible for maintenance and repair of leased properties. (Section 1.12).[8]

\* SEPTA is responsible to defend and indemnify the City for any damages arising from the condition of the leased property. (Section 1.18).[9]

equipment used in the public service, but shall so schedule and conduct such operations as to minimize interference with traffic. The Authority shall repair or replace pavement and other property damaged by such operations. (S.R. p. 392a).

7. 2.06—Maintenance, Replacements and Renewals of Leased Properties

The City shall, directly or through a lessee or contract operator, maintain the Leased Properties in the same condition in which they are received from PTC, reasonable wear and tear excepted. (S.R. p. 392a).

8. 1.12—Maintenance of Leased Properties

The Authority is taking possession of the Leased Properties directly from PTC on an "as is" basis, and neither the City nor the Authority makes any representation as to the condition thereof. Subject to the provisions of Section 1.12, the Authority shall maintain the Leased Properties in good and safe operating condition. The Authority's standards of maintenance of the City Properties shall be subject to review by the Service Standards Committee. (S.R. pp. 419a–420a).

9. 1.18—Liability for Injury or Damage to Persons and Property— Extraordinary Casualty

a) The Authority shall indemnify the City against all claims for injury or damage to persons or property arising out of the operation or maintenance of the Leased Properties or resulting from any act or omission of the Authority, its agents, servants or concessionaires, in the use of the Leased Properties, or from any negligence on its or their part, or from any cause, whether or not attributable to the design, materials or construction of the Leased Facilities, which could have been prevented or avoided by the ordinary diligent and careful maintenance and use thereof; and the Authority shall bear all costs in connection with defending said claims. The indemnity

The City is no longer merely a local government whose streets are occupied by a street railway company with no liability for roadbed maintenance, but the lessee of the street railway company. As such, it is primarily liable at common law for the maintenance of that portion of the street occupied by the street railway in that capacity. Under the City's Leaseback Agreement with SEPTA, SEPTA, however, has agreed to assume the City's obligation for roadbed maintenance and defend and indemnify the City against all claims arising from improper maintenance. If the street railway roadbed is negligently maintained, causing an injury to a third party, SEPTA is then ultimately responsible for the payment of that claim.[10]

SEPTA, however, contends that the roadbed between and adjacent to its tracks is not part of the leased property. It contends that the term "leased properties" is defined in Section 1.02 of the Leaseback Agreement as "the transit system consisting of City properties and SEPTA properties, this lease being intended to cover all transit properties ... heretofore operated by PTC."[11] The inventory of transit system properties attached to the Leaseback includes "surface rail lines" described as "188.5 miles of surface track

provided in this paragraph is solely for the benefit of the City and shall not confer any rights on any other person. (S.R. 422a–423a).

10. We find no merit in SEPTA's position that because it is a "non-profit" transportation authority, it is absolved of any common law liability for failure to make roadbed repairs. Nothing in SEPTA's enabling legislation remotely suggests that obligations that private street railway companies had when SEPTA purchased them abrogated the common law responsibility to maintain the roadbed. Separate and apart from that, SEPTA's liability is imposed by the 1968 Leaseback Agreement. See *Mangini v. Southeastern Pennsylvania Transportation Authority*, 235 Pa.Superior Ct. 478, 344 A.2d 621 (1975).

11. Section 2.01 of the Lease, by which SEPTA initially conveyed the property to the City which it was also leasing back, defined "Leased Properties" as:

The Authority hereby leases to the City, and the City leases from the Authority, all the rest of the SEPTA Properties. The properties so leased, together with all renewals and replacements thereof and ordinary additions thereto and any other properties which may be added thereto by supplement to this Agreement and Lease, are hereinafter called the "Leased Properties" and the lease thereof under this Article II is hereinafter sometimes called the "Lease."

with related electrical transmission facilities and other appurtenances." Because this inventory does not specifically set forth the roadbed, SEPTA contends that the roadbed is not leased property, and accordingly, SEPTA is not obligated to maintain the pavement between and adjacent to SEPTA's tracks.

When examining the conveyance scheme effectuated through the Lease and the Leaseback, neither SEPTA nor the City intended that any obligation to repair the roadbed would ultimately be left with the City. Prior to entering into the Lease, SEPTA, as "soon to be owner of the PTC facilities," had the maintenance responsibility for the roadbed between and adjacent to the street railway tracks. SEPTA's Lease to the City of the "to be acquired PTC properties" momentarily placed on the City maintenance responsibilities for all leased properties, but the Leaseback, signed simultaneously, immediately shifted back to SEPTA all responsibilities for the "soon to be acquired PTC properties," as well as additional maintenance requirements for City-owned properties. The structure of the transaction—SEPTA to the City to SEPTA—of the transit facilities, clearly indicates that the parties intended the maintenance responsibilities for the street railway roadbed to end where they began—with SEPTA.

 Notwithstanding the 1968 Agreement, the City and SEPTA contend that PennDot is responsible for the street railway roadbed, because PennDot, in 1961, adopted those portions of Allegheny Avenue in question as part of Legislative Route 67286, a state-designated highway. *See* Section 202 of the State Highway Act of 1961 (Act), Act of September 18, 1961, P.L. 1389, *as amended,* 36 P.S. § 1758–202. Section 204 of the Act, 36 P.S. § 1758–204, under which PennDot assumed maintenance obligations, provided that such obligations "shall not include portions of such streets which are or may be used and occupied by structures or surface facilities of any public utility company." PennDot argues that under Section 204, those sections of the state highway occupied by SEPTA are not part of the

state highway, and accordingly, PennDot is not liable for maintenance.

SEPTA contends, however, that Section 204 is inapplicable because it is an "agency of the Commonwealth" and not a public utility company, and consequently, PennDot now has responsibility for roadbed maintenance. In *Geraldine Hicks and Arthur Hicks v. Southeastern Pennsylvania Transportation Authority and City of Philadelphia and Commonwealth of Pennsylvania, Department of Transportation*, 139 Pa.Commonwealth Ct. 54, 590 A.2d 31 (1991), we held that Section 204 is applicable to SEPTA and maintenance of the roadbed between the street railway tracks located in a state highway is not PennDot's responsibility. Moreover, absent Section 204, PennDot, as the governmental entity responsible for the Allegheny Avenue right-of-way, would have no responsibility at common law for street railway roadbed maintenance because that responsibility is that of the operator of the street railway, i.e., SEPTA. *Culver.*

■ SEPTA contends that even if it had the obligation to perform roadbed repair and maintenance of the street railway roadbed under the Lease and Leaseback, the City, by voluntarily maintaining and repairing those areas, is estopped from asserting that SEPTA is obligated to perform those duties and is liable for Marie Yackobovitz's injuries. Moreover, SEPTA contends that under Section 324(A) of the Restatement (Second) of Torts,[12] the City, by voluntarily assuming SEPTA's duty to perform that mainte-

12. Section 324(A) provides:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 Section 324(A) was adopted by our Supreme Court in *Cantwell v. Allegheny County*, 506 Pa. 35, 483 A.2d 1350 (1984).

nance, is responsible for Marie Yackobovitz's injuries by its failure to properly perform that gratuitous, but nonetheless assumed duty.

The trial court found and the record supports that from 1968 through November 1984, the City regularly maintained and repaired the roadbed between and adjacent to SEPTA's trolley tracks. However, by letter dated November 27, 1984 (J.R. p. 463a), the City notified SEPTA that under the Lease and Leaseback Agreement, it did not have responsibility to perform the maintenance and would cease to do so. From receipt of that notification, SEPTA could no longer reasonably rely on the City's continued performance of its duty. After this letter was sent, the City's policy was to notify SEPTA of the defect and, because SEPTA never made any repairs to cure the defect, the City would make the repairs in the interest of public safety. (J.R. pp. 292a, 298a, 311a, 312a, 315a–317a, 324a–325a).

However, Marie Yackobovitz was injured in March 1982, before the City had placed SEPTA on notice in 1984 that it was no longer going to perform street railway roadbed maintenance. Under Section 324(A) of the Restatement, a gratuitous performance of a service gives rise to liability to the entity performing that service if it performs it in a negligent manner and causes injury to a third person. *Cantwell*, 506 Pa. at 40, 41, 483 A.2d at 1353. The City's negligent performance, *albeit* gratuitously performed, under Section 324(A) allowed the Yackobovitzs to maintain and recover damages against the City.

■ Even though the Yackobovitzs can recover against the City, the remaining issue is whether SEPTA, under the indemnification provision contained in Section 1.18 of the Leaseback Agreement, is required to indemnify the City for any damages awarded against the City. SEPTA contends that the City, by consistently maintaining the street railway roadbed, induced SEPTA to believe to its detriment that the City would perform all necessary repairs. By assuming this maintenance responsibility, SEPTA claims that the City

is equitably estopped and that the City had responsibility for maintaining the roadbed under the 1968 Agreement.

At least to the Yackobovitzs' claim, we would agree with SEPTA that the City is equitably estopped from filing a cross-claim against SEPTA's gratuitous performance of roadbed maintenance from 1968 to 1984. Equitable estoppel arises where a party undertakes a cause of conduct that another party will justifiably rely on to its detriment. *Brog Pharmacy v. Commonwealth, Department of Public Welfare*, 87 Pa.Commonwealth Ct. 181, 186, 487 A.2d 49, 51–52 (1985). Until 1984, when the City informed SEPTA that it was no longer performing this maintenance, SEPTA could reasonably have relied on the City's assumption of that obligation and the City would be estopped from claiming any contribution from SEPTA for the Yackobovitzs' claim.

However, the Leaseback requires SEPTA to "indemnify the City against all claims for injury or damage to persons arising out of the ... maintenance of the Leased Properties." Even though the City was gratuitously performing SEPTA's roadbed maintenance obligations, SEPTA contends that the City is not entitled to indemnification for its own negligence in failing to perform needed repairs. Moreover, it contends that by its conduct of repairing the roadbed, it has effectively modified the repair obligation as to preclude indemnification.

Insofar as the City is precluded from being indemnified by SEPTA because Marie Yackobovitzs' injuries were the result of the City's own negligence, the Leaseback contains no such exclusion. The Leaseback's indemnity provision indemnifies the City from any and all claims arising out of the inadequate or negligent maintenance of the roadbed, regardless of who was negligent. While the City is liable to the Yackobovitzs pursuant to Section 324(A) of the Restatement and is equitably estopped from reimbursement against SEPTA because of SEPTA's detrimental reliance on the City's gratuitous performance of street railway roadbed maintenance, nonetheless, Section 1.18 of the Leaseback

requires SEPTA to indemnify the City for the Yackobovitzs' award.

■ SEPTA also contends that the City's conduct of assuming roadbed maintenance operated to modify the terms of the agreement to place maintenance responsibilities on the City, making indemnification inapplicable. Initially, SEPTA must overcome Section 3.09 of the Leaseback, which provides "No additions, alterations or amendment corrections in the [Leaseback] shall be binding unless in writing ..." As the Superior Court has stated in *Leasing Service Corporation v. Benson*, 317 Pa.Superior Ct. 439, 449, 450, 464 A.2d 402, 407 (1983):

> Our law generally upholds the validity and sanctity of no-oral modification clauses. See *C.I.T. Corporation v. Jonnet*, 419 Pa. 435, 214 A.2d 620 (1965). In that case, it is noted that valid oral modification of a contract may be found, despite the existence of a no oral modification clause, but only where there is evidence of a waiver of the requirement that modifications be written to be effective.

.Because of the "no modification unless in writing" clause, the City's conduct of assuming roadbed maintenance could not operate to permanently change the contract to have the City assume that obligation or modify SEPTA's obligation to indemnify the City.[13]

## II.

■ SEPTA claims that it is immune from either primary or secondary liability to the Yackobovitzs or the crossclaims of the other governmental parties, because none of those claims fall within any of the exceptions to immunity contained in 42 Pa.C.S. § 8522 relating to sovereign immunity.

SEPTA argues that it cannot be liable under the real estate exception to immunity because it does not "own"

---

**13.** Even if there was an agreement to allow oral modification, it would not be binding. The City's contracts and modifications or changes in contracts must be in writing to be binding on the City. *O'Rourke v. City of Philadelphia*, 211 Pa. 79, 60 A. 499 (1905).

Allegheny Avenue where the accident occurred. Section 8522(b)(4), however, provides that a Commonwealth party is liable for:

A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, *leaseholds* in the possession of the Commonwealth agency ... (Emphasis added).

Because we have determined, *supra*, that "leased property" includes the roadbed between and adjacent to the street railway tracks, and that SEPTA, under the Leaseback Agreement, is responsible for roadbed maintenance, SEPTA is ultimately responsible for claims, absent other defenses, brought as a result of SEPTA's failure to perform that responsibility for a dangerous condition that occurs between those tracks.

■ Even if it had some responsibility for the maintenance of the tracks on Allegheny Avenue, SEPTA also argues that it could not be held liable with the City as a joint tortfeasor under our decision in *Crowell v. City of Philadelphia*, 131 Pa.Commonwealth Ct. 418, 570 A.2d 626 (1990), *allocatur granted*, 525 Pa. 550, 582 A.2d 1311 (1990). SEPTA mischaracterizes its relationship with the City as joint tortfeasors. This relationship and the Lease and Leaseback Agreement is that of "joint venturers," not "joint tortfeasors," and simply does not apply to this situation. In any event, in *Anna Marie Druck and William S. Druck v. Deborah A. Bushman and Pennsylvania Department of Transportation*, 139 Pa.Commonwealth Ct. 182, 590 A.2d 53 (1991), this Court overruled *Crowell* to the extent that a governmental party or a local agency is not immune merely because the action was facilitated by an act of another tortfeasor who was not engaged in criminal conduct at the time of the incident for which an injured party files a claim.

Finally, all governmental parties waived all absolute defenses to sovereign and governmental immunity. SEPTA's contention impermissibly violates its agreement to waive all absolute defenses, because to allow it would mean that none

of the governmental defendants would be liable. Under the defunct *Crowell* doctrine, because all the defendants are governmental parties and joint tortfeasors, the Yackobovitzs would not recover from anyone, because a governmental entity could not be held liable as a joint tortfeasor. Even if this argument continued to be viable, it is precluded by SEPTA's agreement that all absolute defenses to immunity would be waived.

## III.

Pursuant to Pa.R.C.P. 238,[14] the trial court ordered the City and SEPTA to pay the Yackobovitzs $22,724.00 in delay damages. The City and SEPTA, as well as PennDot, contend that Rule 238 is both constitutionally and statutorily unfair. They contend that Rule 238 is unconstitutional as an overextension of the Supreme Court's rulemaking power, as well as being violative of the Equal Protection Clause of the 14th Amendment to the United States Constitution[15] and Article III, Section 32[16] of the Pennsylvania Constitution. Moreover, they contend that the provisions of the Judicial Code relating to sovereign and governmental immunity preclude the imposition of Rule 238-type damages against Commonwealth parties or local agencies.

When Rule 238 was originally promulgated, identical constitutional challenges were made in *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 436 A.2d 147 (1981), *appeal dismissed*, 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982). In *Laudenberger*, our Supreme Court stated that the purpose of Rule 238 was a "primary desire

14. Pa.R.C.P. 238 provides in part that at the request of the plaintiff in a civil action who seeks monetary relief for bodily injury, death or property damages, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff. Rule 238 delay damages are calculated by applying the prime rate published in the first edition of the Wall Street Journal of each calendar year from one year after the cause of action occurs or from the filing of the complaint, whichever is later.

15. U.S. Const. amend. XIV, § 1.

16. Pa. Const. art. III, § 32.

to encourage pre-trial settlement" and, by tolling the running of interest with the extension of a reasonable offer of settlement, "demonstrates the prominent goal of fostering early settlements" and "to alleviate the delay in the disposition of cases, thereby lessening congestion in the courts." *Laudenberger*, 496 Pa. at 59, 436 A.2d at 151. Because of this purpose, the Supreme Court felt that Rule 238 was well within its rulemaking power.[17] Commenting on the alleged violation of constitutional prohibition against enlarging rights, our Supreme Court stated:

> We certainly do not intend to, and will not, promulgate rules in contravention of the constitutional prohibition against abridging, enlarging or modifying substantive rights. However, to interpret this provision too narrowly effects an equally offensive circumscription of our constitutional duties. As we have stated previously, the legislature is forbidden to act in the field of procedure; we are bound to do so by the terms of our authority. This Court should not be prevented from exercising its duty to resolve procedural questions merely because of a collateral effect on a substantive right. Clearly, Rule 238, when viewed from the perspective of its purpose and goal, contributes to the orderly and efficient administration of justice in Pennsylvania, and must stand.

*Laudenberger*, 496 Pa. at 67, 436 A.2d at 155.

The governmental parties contend that because Rule 238 places the burden on defendants without corresponding benefits on plaintiffs, it violates the equal protection and due process provisions of the United States and

---

**17.** The governmental parties cite federal court cases that have held that Rule 238 is substantive rather than procedural and, as such, apply in federal courts on state claims and in state courts on federal claims. *See Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988); *Fauber v. Kem Transportation,* 876 F.2d 327 (3rd Cir.1989). But the substantive/procedural distinction for federal purposes is a completely different analysis than our Supreme Court made to determine whether the Rule improperly "enlarged" rights. *Laudenberger,* 496 Pa. at 61, 436 A.2d at 152. The federal courts apply the analysis that whether a state claim is brought in federal court or vice versa, the "outcome of the litigation" and the relief should be the same. *See Fauber,* 876 F.2d at 330, n. 10.

Pennsylvania Constitutions. Again, in *Laudenberger,* our Supreme Court also found that Rule 238 does not violate those constitutional prohibitions.

In dismissing the constitutional challenge to Rule 238 based on equal protection, our Supreme Court stated:

> Rule 238 obviously creates distinctions between plaintiffs and defendants. The difference upon which the classification rests is that the plaintiffs have been wrongly injured and have suffered financial losses because of the defendants' action. The losses then become exacerbated by defendants' refusal to settle the lawsuit in a timely fashion. The defendants, on the other hand, have suffered no wrong. They, as the tortfeasors, are not unjustly deprived of compensation during the course of pre-trial delays. On the contrary, it is in the best interests of the defendants to protract the litigation process as long as possible, so that they may benefit from the funds rightfully owing to the plaintiffs.

*Laudenberger,* 496 Pa. at 65, 69, 436 A.2d at 156.

The Supreme Court then held "that the operation of Rule [238] bears a fair and substantial relation to its articulated goal—the encouragement of defendants to settle meritorious claims as soon as reasonably possible." Because of this purpose, the Supreme Court found "that the difference in treatment of defendants is [not] constitutionally invalid." *Laudenberger,* 496 Pa. at 69, 436 A.2d at 156.

Addressing the substantive due process argument, our Supreme Court stated that whether a law or a rule complies must be measured as to "whether the law in question is rationally related to a legitimate state goal, or whether the state action works to deny an individual of life, liberty or property." *Laudenberger,* 496 Pa. at 70, 436 A.2d at 157. Applying their standard to Rule 238, our Supreme Court found that it met that standard, holding that "there can be no question that the efficacious attempt to clear the docket as soon as possible of those cases which can and should be settled is a legitimate and worthwhile

governmental objective." *Laudenberger*, 496 Pa. at 70, 436 A.2d at 157.

As to the governmental parties' contention that the Judicial Code provisions relating to governmental [18] and sovereign immunity [19] preclude the imposition of delay damages, this was directly addressed by the Supreme Court in *Pivirotto v. City of Pittsburgh*, 515 Pa. 246, 528 A.2d 125 (1987). Addressing an identical claim, the Court stated:

> The power to promulgate procedural rules governing business in the courts rests exclusively in the judiciary, PA. Const. Art. V, § 10(c). The same constitutional provision suspends the operation of statutes which are inconsistent with procedural rules promulgated by this Court. Thus, Section 333 cannot save the city from the requirement to pay delay damages under Rule 238, and we reject the argument that the city is immune from payment of delay damages.

*Pivirotto*, 515 Pa. at 255, 528 A.2d at 130.

In *Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986), the Supreme Court suspended "old" Rule 238, because it automatically imposed delay damages on defendants no matter who was at "fault" for the delay, the rationale underlying *Laudenberger* survived with the promulgation of "new" Rule 238, adopted November 7, 1988. In *Craig*, *Pivirotto* and in the comments to the "new" Rule 238, our Supreme Court stated that it did not alter the basic underpinnings of the *Laudenberger* decision, i.e., that Rule 238 is within the rulemaking power of the Supreme Court and it does not violate any defendants' constitutional rights.

To convince this Court to overturn Rule 238, the governmental parties cite extensively from the dissents in *Laudenberger* and other cases sustaining the propriety of Rule 238. They must recognize, however, that the majority opinions

18. 42 Pa.C.S. §§ 8541–8542.
19. 42 Pa.C.S. §§ 8521–8522.

and not the dissents are binding on this Court. The City's, SEPTA's and PennDot's challenge to Rule 238 must be denied.

## IV.

Complicating an already complicated case was the trial court's holding PennDot in contempt for failure to comply with a purported settlement of record.[20] Initially, PennDot had agreed in settlement conference to pay one-third of the cost of any award. After the trial court made the award, PennDot refused to pay its one-third share of the award because the award imposed no liability on Penn-Dot and PennDot believed that violated the agreement for it to pay a one-third share, as well as the changes that occurred in proceedings prior to the entering of the award. The trial court, upon the filing of a Petition for Contempt filed by the Yackobovitzs, ordered PennDot to pay one-third of the award, to pay $1,000 to the Yackobovitzs for counsel fees, and if PennDot did not pay its share of the award within 30 days, directed that PennDot be fined $1,000 per day for each and every day they failed to pay. PennDot

20. The record evidences a variance between who was cited for contempt and who was held in contempt. The Yackobovitzs filed a "Petition to Hold Defense Counsel in Contempt and For the Award of Attorney's Fees," (S.R. p. 41) and their "wherefore clause" sought the same relief. (S.R. p. 46). The trial court's order on that Contempt Petition, however, provided (S.R. p. 132):

AND NOW, this 15th day of December, 1989, upon consideration of the Petition to Hold Commonwealth Pennsylvania Department of Transportation in Contempt of Court for failure to comply with settlement of record, it is hereby ORDERED and DECREED that said Petition is GRANTED.

Is further ORDERED and DECREED as follows:

The Commonwealth of Pennsylvania Department of Transportation pay plaintiff, Marie Yackobovitz, $12,067, one-third of $38,000, the amount of damages pursuant to Rule 190 High/Low Arbitration Agreement. Defendant shall pay counsel fees of $1,000 and shall comply with this Order within 30 days, after which he will be fined $1,000 a day for non-compliance.

PennDot's counsel was never found in contempt and PennDot was never cited for contempt. Because PennDot did not contend that it was improperly cited, that issue is waived.

appeals the finding of contempt.[21]

To a large extent, this contempt was the result of the parties' machinations to have settled which governmental body had an obligation for roadbed maintenance between and adjacent to street railway tracks, and incidentally, attempt to resolve the Yackobovitzs' claim seven and one-half years after it arose. When agreeing to submit this matter to "high/low" arbitration, each governmental defendant agreed to pay one-third of the cost of the award. When the matter of liability was resolved, the liable defendant(s) would reimburse the non-liable defendant(s). Underlying this agreement, however, the parties and the trial court initially believed that it would not address the liability between defendants, but would only determine the amount of damages incurred by the Yackobovitzs. Everyone envisioned that the liability for roadbed maintenance would be certified to this Court for resolution.

Once the "high/low" arbitration proceeding was underway, the trial court properly recognized that the case was not ripe for appellate review unless a determination was made as to what governmental entity was responsible for street maintenance. Even though the parties had agreed to each pay one-third of the award under the "settlement," the trial court found that the City was primarily liable and SEPTA secondarily liable, and absolved PennDot of any liability.

Because PennDot believed that the original understanding underlying the original settlement had been vitiated by the order of the trial court finding liability as to the governmental entities and absolving PennDot of any liability, PennDot refused to pay one-third of the award and the Yackobovitzs filed the Petition for Contempt which was granted by the trial court.

21. A review of the trial court's December 15, 1989 contempt order reveals that the trial court intended to hold the Commonwealth in civil contempt. Its dominant purpose was to prospectively coerce PennDot to comply with an order of this Court, and accordingly, its purpose was civil. See *Crozer–Chester Medical Center v. Moran*, 522 Pa. 124, 131, 560 A.2d 133, 137 (1989).

Because of the tangled web woven by the parties to shortcut normal procedures to have the matter resolved, we can understand the trial court's frustration when it accommodated an unusual proceeding concocted by the parties in a fruitless attempt to expedite the matter, then having one party refuse to go along with what the trial court believed to have been the subject of agreement. Having said all that, however, the trial court improperly found PennDot in contempt.

To insure that a party has notice of what he is being charged with contempt as a condition precedent, that party must have violated a directive of the court memorialized in a definitive and clear order. *Sutliff v. Sutliff*, 361 Pa.Superior Ct. 194, 522 A.2d 80 (1987). The settlement discussion where each party agreed to pay one-third of the award was never embodied in such an order. To enforce an unquestioned settlement agreement, it is necessary for the party seeking to enforce the settlement to file a Petition to Enforce Settlement. *See Curti v. Ochodski*, 361 Pa.Superior Ct. 115, 521 A.2d 954 (1987). Failure to pay any award resulting from an order resulting in the filing of the Petition to Enforce would then subject the disobeying party to the contempt process. *Pennypack Woods Home Ownership Association v. Regan*, 298 Pa.Superior Ct. 170, 444 A.2d 715 (1982).

Where there is a dispute, as here, as to the terms or the existence of a settlement agreement, there must be an evidentiary hearing. In *Christian v. Allstate Insurance Company*, 348 Pa.Superior Ct. 252, 502 A.2d 192 (1985), the Superior Court stated that:

> Where the pleadings raise an issue of fact relative to a purported settlement, the trial court must conduct an evidentiary hearing; and where it fails to do so, its failure is not waived by a party's failure to object.

Here, PennDot believed that the settlement between the parties was no longer in existence. Prior to finding Penn-Dot in contempt, the trial court would have had to hold an evidentiary hearing and make findings as to the terms of

the agreement and whether the agreement still existed. Once it found that the agreement and PennDot failed to pay, the contempt process would then be appropriate. Because the trial court failed to follow that procedure, it could not hold PennDot in contempt.

Additionally, not only was the Petition for Contempt the wrong vehicle to enforce settlement, the Yackobovitzs were the wrong party to seek contempt or enforce settlement. The trial court found that the City was primarily liable and SEPTA secondarily liable. The Yackobovitzs' remedy was to enforce the court's order against those parties to pay in accordance with the court's order and not with a disputed agreement. If the City and SEPTA felt that PennDot had agreed to contribution no matter the outcome of the high/low arbitration, it was up to them to enforce settlement against PennDot. We find that the trial court erred in holding PennDot in contempt.

## V.

Accordingly, we find that the City is obligated to pay the Yackobovitzs $38,000.00 in compensatory damages and $22,724.00 in Rule 238 damages; SEPTA is to indemnify the City for the amount of that award, and the trial court's order finding PennDot in contempt and the awarding of counsel fees is reversed.

## ORDER

AND NOW, this 15th day of April, 1991, the order of the Court of Common Pleas of Philadelphia County is affirmed to the extent that it ordered the City of Philadelphia to pay Marie and Edward Yackobovitz an award of $38,000.00 in compensatory damages and $22,724.00 in Rule 238 delay damages. It is further ordered that the Southeastern Pennsylvania Transportation Authority is to indemnify the City for the amount of that award.

The order is reversed, however, to the extent that it found the Commonwealth of Pennsylvania, Department of

Transportation, in contempt and ordered the payment of counsel fees.