**CITY OF PHILADELPHIA, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 1998.
Decided Nov. 20, 1998.

Mark R. Zecca, Philadelphia, for petitioner.

Susan D. Colwell, Harrisburg, for respondent.

Before BERNARD L. McGINLEY, J., DAN PELLEGRINI, J., JOSEPH F. McCLOSKEY, Senior Judge.

PELLEGRINI, Judge.

The City of Philadelphia (City) appeals from an order of the Pennsylvania Public Utility Commission (PUC) reassigning to it certain maintenance responsibilities for the Woodland Avenue Bridge (Bridge) that this Court in *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission,* 140 Pa.Cmwlth. 270, 592 A.2d 797 (Pa.Cmwlth.1991), *petition for allowance of appeal denied,* 531 Pa. 642, 611 A.2d 714 (1992) (*SEPTA I*), ordered be borne

by Southeastern Pennsylvania Transportation Authority (SEPTA).

On October 8, 1987, the PUC began an investigation into the maintenance of the rail-highway crossing at the Woodland Avenue Bridge crossing. The Bridge carries Woodland Avenue, a City street, as well as SEPTA trolley tracks, over two sets of SEPTA's electrified railroad tracks. On July 16, 1990, the PUC entered an order permanently assigning the future maintenance responsibilities for the substructure and superstructure of the Bridge to SEPTA, while assigning the maintenance responsibilities for the roadway, sidewalks and curbs to the City. Both the City and SEPTA appealed that order to this Court.

Before this Court, SEPTA argued that because it was a commuter rail authority, the PUC was prohibited from assigning it the maintenance responsibilities under 45 U.S.C. §581(c)(5).[1] That provision exempts commuter rail authorities, like SEPTA, from "taxes and other fees" relating to the operation of commuter rail lines to the same extent as National Rail Passenger Corporation (Amtrak) is exempt. After examining the congressional purpose and intent behind its enactment, as well as the federal decisions interpreting that section, we found that the assignment of maintenance costs was not a "tax" or "fee" as used in that provision. Because maintenance costs were not a tax or a fee, we held that the PUC could impose on SEPTA its fair share of costs to maintain a crossing and dismissed its appeal.

Regarding the City's appeal from the PUC's order to bear the costs for maintenance of the roadway, we remanded the matter to the PUC with instructions to determine whether the City had maintenance responsibilities by taking into consideration our then recent decision in *Yackobovitz v. Southeastern Pennsylvania Transportation Authority*, 139 Pa.Cmwlth. 157, 590 A.2d 40 (Pa.Cmwlth.1991), holding that under Lease and Leaseback Agreements between SEPTA and the City, SEPTA had responsibility for maintenance of the roadway. On remand, on June 21, 1995, the PUC modified its July 16, 1990 order by imposing maintenance responsibility of the roadway on SEPTA. SEPTA did not appeal our decision in *SEPTA I*, nor did it appeal the PUC's order of June 21, 1995, assigning it liability for the roadway.

Attempting to avoid the enforcement of three other PUC orders allocating part of the costs of maintaining three other highway bridges,[2] SEPTA filed an action in federal court contending that 45 U.S.C. § 581(c)(5) exempted it from paying its maintenance responsibilities because they were taxes or fees. In *Southeastern Pennsylvania Transportation v. Pennsylvania Public Utility Commission*, 826 F.Supp. 1506 (E.D.Pa. 1993), *affirmed per curiam*, 27 F.3d 558 (3d Cir.), *cert. denied*, 513 U.S. 928, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994), the district court, following the Third Circuit's analysis in *National Railroad Passenger Corporation v. Commonwealth of Pennsylvania, Public Utility Commission*, 848 F.2d 436 (3d Cir.),[3]

---

1. Section 45 U.S.C. § 546(b) provides:

   Notwithstanding any other provision the National Railroad Passenger Corporation (the "Corporation") shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State or local taxing authority, which are levied on the Corporation, or any railroad subsidiary thereof, from and after October 1, 1981, including such taxes and fees levied after September 30, 1982: Provided, however, that notwithstanding any provision of law, the Corporation shall not be exempt from any taxes or other fees which it is authorized to pay as of September 10, 1982.

2. The three bridges at issue were the Montgomery Avenue Bridge in Lower Merion Township, the Swedesford Bridge in Upper Gwynedd Township and the Johnson Street and Willow Grove Avenue Bridges in Philadelphia.

3. Our decision in *SEPTA I* rejected the reasoning of the Third Circuit but instead relied on the reasoning of the Second Circuit in *National Railroad Passenger Corporation v. City of New York*, 882 F.2d 710 (2nd Cir.1989). Recently, in *City of Philadelphia v. Consolidated Rail Corporation*, (Special Court No. 96–RR–1, No. 96–RR–03 November 3, 1997), the United States District Court for the District of Columbia (Weiner J. of the United States Court for the Eastern District of Pennsylvania sitting by designation) sitting as successor to the Special Court created under the Regional Railroad Act, also rejected the Third Circuit analysis and found that because maintenance costs were not taxes or fees, Amtrak was required to pay its share of costs at crossings.

*cert. denied,* 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988), held that requiring SEPTA to share maintenance costs at crossings was a "tax" or "fee" and enjoined the PUC from allocating any costs for the maintenance of those three bridges to SEPTA.

Emboldened by its success, and although our order in *SEPTA I* was final in 1991, and the PUC's order implementing that order of June 21, 1995, was not appealed, SEPTA filed a suit in federal court on July 24, 1995, seeking, in effect, to abrogate our decision as well as the PUC's orders imposing maintenance responsibilities on it with regard to the Bridge. On January 19, 1996, the PUC and SEPTA entered into a consent decree in which the PUC agreed in all crossing cases to refrain from assessing the costs of or responsibility for the construction, reconstruction, inspection, maintenance or repair of any highway bridge and to reopen any proceedings within its jurisdiction where it had assessed SEPTA any of those costs, and to reassign the costs to parties other than SEPTA. None of the parties affected by that decree or potentially affected by the decree were apparently given notice or were parties to the decree.[4] Consistent with their consent degree but contrary to our order in *SEPTA I* and its own unappealed order, the PUC issued a Temporary Reallocation Order on March 14, 1996, reassigning the maintenance costs and responsibilities for the Bridge that had originally been imposed on

SEPTA to the City.[5] On February 13, 1998, the PUC issued a final order modifying its July 16, 1990 order and permanently assigned all maintenance costs for the Bridge to the City. This appeal followed.

The City argues that the PUC is barred from reassigning to it maintenance responsibilities for the Bridge that were previously assigned to SEPTA in accordance with our order and none of the reasons advanced by the PUC justify its failure to follow our order. For its part, the PUC contends that its conduct in deviating from our prior remand order and vacating its own unappealed orders is justified because:

- the intervening federal consent decree was an intervening change in the law that allowed it to depart from our remand order;
- even though the City was not a party to the consent decree, it had to go to federal court to challenge the order, and
- it was free to alter its prior orders in this matter even though it was contrary to our decision and remand order.

We find these arguments, at best, to be disingenuous.

### I.

The PUC argues that it was allowed to deviate from the decision of this Court because there had been "an intervening change

---

**4.** In addition to the three bridges covered by the prior order and while there may be others, the consent decree covered 19 other bridges throughout southeastern Pennsylvania. Other parties that may be affected by the consent decree are the Pennsylvania Department of Transportation, other municipalities and railroads, and utilities that had facilities located in crossings. Under the consent decree, even though they were not parties or notified, they would purportedly have to bear SEPTA's share of maintenance responsibilities.

**5.** Meanwhile, in May 1996, we were again faced with the question of whether commuter rail authorities such as Amtrak were exempt from paying maintenance costs for rail-highway crossings that it owned and also whether the PUC had the authority to impose costs on such authorities in *City of Philadelphia v. Pennsylvania Public Utility Commission,* 676 A.2d 1298 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 546 Pa. 657, 684 A.2d 558 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997) (Phila-

delphia). In that case, the PUC adopted the finding of an administrative law judge (ALJ) who found that the City should be responsible for maintaining the 41st Street Bridge, partly because he found that the PUC had no authority to order Amtrak to repair and maintain the bridge. The City appealed contending that the PUC erred in not considering Amtrak for maintenance costs because our decision in *SEPTA I* held that SEPTA and, therefore, Amtrak, was not exempt from being assessed maintenance costs. We agreed holding that our decision in *SEPTA I* made clear that commuter authorities could be responsible for maintaining the bridge and such costs were not a tax or a fee from which SEPTA and Amtrak were exempt. We carefully analyzed our decision in *SEPTA I* and our analysis concerning the relevant statutory and case law and concluded that our decision in *SEPTA I* was correctly precluding the PUC from removing Amtrak as a potentially responsible party.

in the controlling law in the form of the consent decree entered in the district court." The "change in the law" principle is an exception to the "law of the case" that our Supreme Court recently explained in *Com. v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995), as follows:

At the outset, this Court has long recognized that judges of coordinate jurisdiction sitting in the same case should not over-rule each others' decisions. This rule, known as the "coordinate jurisdiction rule," is a rule of sound jurisprudence based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency.

In our view, this *coordinate jurisdiction* rule falls squarely within the ambit of a generalized expression of the "law of the case" doctrine. This doctrine refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: *(1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter;* (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

\* \* \* \* \* \*

Further, the limitations on the law of the case doctrine and on the coordinate jurisdiction rule are virtually identical, thereby again suggesting that the Pennsylvania coordinate jurisdiction rule may be properly considered as part of the family of rules making up the law of the case doctrine. Departure from either of these principles is allowed only in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed.

*Id.* at 573–76, 664 A.2d at 1331–32 (emphasis added) (citations omitted).

■ While a change in the law is an exception to the law of the case, that doctrine is simply inapplicable here. First, all the orders in this case were final and either unappealed or all appeals had been exhausted. When that occurs, no matter how radically the law changes, prior orders cannot change because both courts and administrative agencies are divested of any jurisdiction over the case other than to seek enforcement or enforce their orders. Moreover, a consent decree cannot be considered a change in the law; a change in the law is when a new statute is enacted or there is a change in judicial interpretation that applies to all cases similar situated, not a manufactured change through a consent decree entered into by two parties.

In any event, even if the PUC arguably presented a change in the law that as an adjudicator it believed now controlled and not one it manufactured, that, in no way, binds us to make the same determination. Separate and apart from the preclusive effect of *SEPTA I*, the City had a right to appeal any determination contending that a change in the law had not occurred or that it was inapplicable. Because there has been no change in the law since *SEPTA I* as confirmed by *Philadelphia,* we would have reversed the PUC's order in that the "law of the case" required the PUC to follow our remand order.

## II.

By saying that the City cannot challenge the impact of the federal consent decree in this Court, what the PUC is saying, without expressly stating so, is that the consent decree controls and must be given preclusive effect, and that our orders which have been effectively imposing certain maintenance responsibilities on SEPTA are no longer opera-

tive. However, the City is not seeking to challenge the consent decree to which it was not a party, but to have our prior order imposing maintenance obligations on SEPTA given preclusive effect as required by the Full Faith and Credit Act, 28 U.S.C. §1738.[6] *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). If the PUC had litigated the matter, the district court would have been required to give it preclusive effect because "[w]hen a prior case has been adjudicated in a state court, federal courts are required by 28 U.S.C. §1738 to give full faith and credit to the state judgment and ... apply the same preclusion rules as would the courts of that state. *Decisions of state administrative agencies that have been reviewed by state courts are also given preclusive effect in federal courts."* *Edmundson v. Borough of Kennett Square*, 4 F.3d 186 (3d Cir.1993) (emphasis added) (citations omitted). This is so, even though state courts have interpreted a statute differently than federal courts. In *General Motors Corporation Pick–Up Truck Fuel Tank Products Liability Litigation*, 134 F.3d 133 (3d Cir.1998), the Third Circuit has recently stated:

> As interpreted by the Supreme Court, section 1738 "directs all courts to treat a state court judgment with the same respect that

it would receive in the courts of the rendering state." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996). We may not " 'employ [our] own rules ... in determining the effect of state judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.' " *Id.* (citing *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982)); *see also In re Glenn W. Turner Enterprises Litig.*, 521 F.2d 775, 780 (3d Cir.1975) ("absent statutory or constitutional directive, the state and lower federal courts are independent, and ... a federal action is not superior to a state proceeding merely because of its federal character ... judgments resulting from federal actions are not preferred to judgments resulting from state actions because of their federal character").

*Id.* at 141–42.

Particularly apropos to the facts of this case is *Delaware Valley Citizens' Council for Clean Air, supra*, where the Third Circuit addressed a similar conflict between the orders of a state and federal court. In that case, the Third Circuit addressed the effect of our Supreme Court's decision in *Scanlon v. Department of Transportation*, 502 Pa.

---

6. Article 4, Section 1 of the United States Constitution Provides:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

> 28 U.S.C. § 1738 implements Article 4, Section 1 and provides in pertinent part:

> The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form. Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

"Although Congress implemented the Constitution's full faith and credit clause of Article IV, §1, in language referring only to state courts, there "is a clearly established rule that state courts must give full faith and credit to the proceedings of federal courts[.] That this is the rule is beyond doubt, and the state courts have generally accepted it. The Supreme Court has consistently assumed that the implementing statute requires such recognition. Thus, in *Embry v. Palmer*, 107 U.S. 3, 17 Otto 3, 27 L.Ed. 346 (1882), the Court concluded that "the judgments of the courts of the United States have invariably been recognized as upon the same footing, so far as concerns the obligation created by them, with domestic judgments of the States, whenever rendered and whenever sought to be enforced." *Id.* 107 U.S. at 10. (citations omitted). *See also Hancock National Bank v. Farnum*, 176 U.S. 640, 20 S.Ct. 506, 44 L.Ed. 619 (1900); *Supreme Lodge, Knights of Pythias v. Meyer*, 265 U.S. 30, 33, 44 S.Ct. 432, 433, 68 L.Ed. 885 (1924); *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 755 F.2d 38, 43 (3rd Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985).

577, 467 A.2d 1108 (1983), holding that representatives of PennDOT did not have the authority to enter into a consent decree in federal court that required the state to begin an automobile emission program without the consent of the General Assembly and, consequently, it was without effect. In affirming the refusal of the district court to vacate a consent decree on the basis of our Supreme Court decision, the Third Circuit held that our Supreme Court's decision was an impermissible collateral attack on the federal judgment. "What was attempted in the state courts and the ostensible relief granted by the state's highest court, of course, flies in the face of settled law and the doctrine of *res judicata.*" 755 F.2d at 43. It then went on to observe:

> Unsuccessful in the district court and this court, and rebuffed by the United States Supreme Court, members of the Pennsylvania legislature, as private litigants, attempted a collateral attack on the several final judgments of the federal courts—both trial and appellate. What was attempted in the state courts and the ostensible relief granted by the state's highest court, of course, flies in the face of settled law and the doctrine of res judicata. The issue is not novel. The attempt has been made before. But the United States Supreme Court has issued clear instructions when collateral attacks on final federal court judgments are attempted by state court systems:
>
> Congress ... has in no way relaxed the old and well-established judicially declared rule that state courts are completely without power to restrain federal-court proceedings in in personam actions like the one here. And it does not matter that the prohibition here was addressed to the parties rather than to the federal court itself. For the heart of the rule as declared by this Court is that:
>
> "[W]here the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court.... The fact, therefore, that an injunction issues only to the parties before the court, and not to the court, is no evasion of the difficulties that are the nec-essary result of an attempt to exercise that power over a party who is a litigant in another and independent forum." *Donovan v. City of Dallas,* 377 U.S. 408, 413, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964), (quoting *Peck v. Jenness,* 7 How. 612, 625, 12 L.Ed. 841 (1849)).

755 F.2d at 42–43 (per Aldisert, C.J.) (citations omitted).

■ While *Delaware Valley* involved a latter state decision that affected an earlier consent decree rather than, as here, a latter federal consent decree that affects an earlier state court judgment, we make the same observation: Unsuccessful before the PUC and this Court and rebuffed by our Supreme Court, SEPTA attempted a collateral attack on the several final judgments of the Public Utility Commission and the courts of this Commonwealth that was acceded to by the PUC. What was attempted in the federal court and the ostensible relief granted by the district court, of course, flies in the face of settled law and the doctrine of *res judicata.* "[W]here the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court.... The fact, therefore, that an injunction issues only to the parties before the court, and not to the court, is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum." *Donovan v. City of Dallas,* 377 U.S. 408, 413, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964), (quoting *Peck v. Jenness,* 7 How. 612, 625, 12 L.Ed. 841 (1849)). Because the federal consent decree cannot take away the City's right confirmed in the proceedings before this Court, the City is not foreclosed from challenging the PUC's reassignment of SEPTA's maintenance responsibilities to it or this Court from addressing the propriety of that reassignment.

### III.

■ Finally, the PUC contends that it had the authority under Section 703(g) of the

Public Utility Code, 66 Pa.C.S. § 703(g) [7] to rescind its prior order that we entered assigning SEPTA maintenance responsibilities. Although the PUC has the power to modify or rescind orders subject only to the requirements of due process, our Supreme Court has stated that power must be "granted judiciously and only under appropriate circumstances" because such relief may result in the disturbance of final orders. *City of Pittsburgh v. Pennsylvania Department of Transportation*, 490 Pa. 264, 416 A.2d 461 (1980).[8] *See also Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 721 F.Supp. 710 (M.D.Pa.1989) (claim preclusion may apply to rate filings notwithstanding the authority of the PUC to amend or rescind orders, citing to *City of Pittsburgh*). It contends that the "appropriate circumstance" is "whether a consent decree entered in federal court presents enough of a change in the already approved cost allocation where the new allocation is also just, reasonable and supported by substantial evidence." While a PUC order allocating costs can be changed if there is a showing of a dramatic change in usage of the Bridge by the parties to the crossing over time, a consent decree in another jurisdiction to get around an order of this Court is not a cognizable appropriate circumstance, but a subterfuge that we condemn.

### IV.

Accordingly, for all of the above reasons, the order of the PUC is reversed and the PUC is directed to enter an order consistent with its orders of July 16, 1990 and June 21, 1995, with respect to the Woodland Avenue Bridge. However, while we have reinstated the orders, that does not resolve two significant problems that could frustrate its implementation. First, the PUC is between a "rock and a hard place" by having to comply with our order and the inadvisably entered

consent decree in federal court. Second, and more importantly, the PUC has compromised its ability to give the City a fair hearing because it has ceded away its adjudicatory powers regarding SEPTA when it entered into the consent decree by agreeing that it would not allocate to it maintenance costs at crossings. As we stated in *Philadelphia*, "By entering into the consent decree agreeing not to allocate costs to SEPTA, the PUC has prejudged [the matter thereby depriving] those parties of their due process rights to a full and fair hearing." 676 A.2d at 1307, fn. 16. To resolve the problems of implementing our order and to insure then that the City's or other parties at the crossing's due process rights are not violated by the predicament that the PUC has placed itself in by ceding away its adjudicatory responsibilities, we will retain jurisdiction over this case. All matters relating to the crossing at the Woodland Avenue Bridge will be filed directly with the Office of the Chief Clerk of this Court until further order.

### *ORDER*

AND NOW, this 20th day of November, 1998, the order of the Pennsylvania Public Utility Commission at No. I–870064, dated February 13, 1998, is reversed. It is further ORDERED that the PUC is to enter an order consistent with its previous orders of July 16, 1990 and June 21, 1995, both also at No. I–870064 assigning future maintenance responsibilities for the substructure, superstructure and the roadway (bituminous wearing surface) of the Woodland Avenue Bridge to SEPTA. We retain jurisdiction and all matters relating to the crossing at the Woodland Avenue Bridge will be filed directly with the Office of the Chief Clerk of this Court until further order.

---

7. Section 703(g) provides:

The commission may, at any time, after notice and the opportunity to be heard as provided in this chapter, rescind or amend any order made by it. Any order rescinding or amending a prior order shall, when served upon the person, corporation or municipal corporation affected, and after notice thereof is given to the

other parties to the proceedings, have the same effect as is herein provided for original orders.

8. Our Supreme Court decided this case under then Section 1007 of the Public Utility Code, 66 P.S. § 1397, the predecessor to the present Section 703 of the Code, 66 Pa.C.S. § 703, which is nearly identical to the present language in Section 703(g).